UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RICHARD KIMBRO,

          Plaintiff,

     v.

MIRANDA, et al.,

          Defendants.

No.  2:  12-cv-2154 MCE KJN P

FINDINGS AND RECOMMENDATIONS

Introduction

       Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983.  Pending before the court is defendants' motion for summary judgment. (ECF No. 85.)  Defendants argue that they are entitled to qualified immunity.  For the following reasons, the undersigned recommends that defendants' motion be granted in part and denied in part.

Legal Standard for Summary Judgment

       Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

////

1

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)).

"Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

2

1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

(9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d

1564, 1575 (9th Cir. 1990).

In the endeavor to establish the existence of a factual dispute, the opposing party need not

establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

255.  All reasonable inferences that may be drawn from the facts placed before the court must be

drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

are not drawn out of the air, and it is the opposing party's obligation to produce a factual

predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

demonstrate a genuine issue, the opposing party "must do more than simply show that there is

some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

By contemporaneous notice provided on July 30, 2014, (ECF No. 22-2), plaintiff was

advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal

Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc);

Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

////

1    Legal Standard for Qualified Immunity

2           In analyzing a claim of qualified immunity, a court must examine (1) whether the facts as

3    alleged, taken in the light most favorable to plaintiff, show that the defendant's conduct violated a

4    constitutional right, and (2) if a constitutional right was violated, whether, "in light of the specific

5    context of the case," the constitutional right was so clearly established that a reasonable official

6    would understand that what he or she was doing violated that right.  See Saucier v. Katz, 533 U.S.

7    194, 201–02 (2001).  If no constitutional right was violated, the inquiry ends and the defendant

8    prevails.  Saucier, 533 U.S. at 201.

9           To meet the "clearly established" requirement, "[t]he contours of the right must be

10   sufficiently clear that a reasonable official would understand that what he is doing violates that

11   right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  This requires defining the right

12   allegedly violated in a "particularized" sense that is "relevant" to the actual facts alleged.  Id.

13   "Because the focus is on whether the officer had fair notice that her conduct was unlawful,

14   reasonableness is judged against the backdrop of the law at the time of the conduct."  Brosseau v.

15   Haugen, 543 U.S. 194, 198 (2004).

16          Courts are not required to address the two inquiries in any particular order.  Rather, courts

17   may "exercise their sound discretion in deciding which of the two prongs of the qualified

18   immunity analysis should be addressed first in light of the circumstances in the particular case at

19   hand."  Pearson v. Callahan, 555 U.S. 223, 243 (2009).

20   Plaintiff's Claims

21          This action is proceeding on the original complaint as to the following claims:  1)

22   defendant Physician's Assistant Miranda allowed plaintiff's medication to expire; 2) on

23   September 18, 2008, defendant Licensed Vocational Nurse Clark denied plaintiff his medication;

24   3) on December 23, 2008, defendants Correctional Officers McBride and Kelly made plaintiff go

25   outside in his underwear and shower shoes when there was snow on the ground; 4) on December

26   23, 2008, defendants Correctional Officers Leon and Morris transported plaintiff outside in his

27   underwear and shower shoes after taking over his transport from defendants McBride and Kelly;

28   5) on December 23, 2008, defendant Correctional Sergeant Hougland applied leg irons so tightly

4

1    on plaintiff that plaintiff's legs bled; 6) on December 23, 2008, defendants Correctional Officers

2    Leon and Morris used excessive force causing plaintiff to suffer back injuries.

3           The undersigned describes plaintiff's claims herein.

4           *Claims Against Defendant Miranda*

5           Plaintiff alleges that in 2006, he was diagnosed with kidney stones while housed at Salinas

6    Valley State Prison ("SVSP").  (ECF No. 1 at 4.)  Plaintiff was later transferred to Mule Creek

7    State Prison ("MCSP").  (Id.)  While at MCSP, plaintiff was sent to a urologist who

8    recommended surgery.  (Id.)  Plaintiff was sent to High Desert State Prison ("HDSP") before he

9    could receive surgery.  (Id.)

10          In June 2008, plaintiff was having severe problems with his kidneys.  (Id.)  On June 16,

11   2008, plaintiff was sent to see former defendant LaJeunesse, a urologist located in Reno, Nevada.

12   (Id.)  Defendant LaJeunesse told plaintiff that he would receive surgery on his right kidney first

13   and that stents would be implanted during the surgery.  (Id.)  Defendant LaJeunesse told plaintiff

14   that it was important to remove the stents to prevent infection.  (Id.)

15          The first surgery occurred on July 9, 2008, as planned.  (Id.)  On July 18, 2008, plaintiff

16   was seen for follow-up.  (Id. at 5.)  At that time, plaintiff was having problems with the stents and

17   was told that he would have the second surgery within one month and the stents would be

18   removed at that time.  (Id.)

19          Plaintiff was not returned to defendant LaJeunesse for the second surgery on August 18,

20   2008, as planned.  (Id.)  Plaintiff's medications, which had been prescribed following the first

21   surgery, began to expire.  (Id.)  Plaintiff became ill and had large amounts of blood in his urine.

22   (Id.)

23          Plaintiff alleges that from August 18, 2008, until September 9, 2008, Nurse Ling referred

24   plaintiff to defendant Miranda on an emergency basis because of pain and because plaintiff had

25   not been returned to Reno for his second surgery.  (Id. at 5-6.)  Plaintiff alleges that he suffered an

26   infection because defendant Miranda allowed his medications to expire.  (Id.)

27   ////

28   ////

*Claims Against Defendant Clark*

On September 17, 2008, plaintiff returned to Reno for his second surgery.  (Id. at 6.)  On September 17, 2008, plaintiff returned to HDSP after his surgery.  (Id.)  When plaintiff went to the pill line on the morning of September 18, 2008, to receive his medication, defendant Clark allegedly denied plaintiff all of his medications.  (Id.)  Defendant Clark told plaintiff that after he left the prison on September 17, 2008, all of his medications were thrown out.  (Id.)  Plaintiff did not receive his medication for six days and suffered severe pain.  (Id.)

*Claims Against Defendants McBride and Kelly*

Plaintiff alleges that on December 23, 2008, defendants McBride and Kelly came to his cell door.  (Id. at 10.)  They told plaintiff to cuff up.  (Id.)  They told plaintiff that he was being taken to see the sergeant.  (Id.)  Plaintiff cuffed up in his underwear and shower shoes.  (Id.)  Defendants took plaintiff outside even though he was wearing only his underwear and shower shoes.  (Id.)  Snow was on the ground.  (Id.)

*Claims Against Defendant Hougland*

Plaintiff alleges that on December 23, 2008, defendant Hougland placed leg irons on his lower legs.  (Id. at 11.)  Plaintiff alleges that the leg irons were so tight that they cut into his legs and caused bleeding.  (Id.)

*Claims Against Defendants Leone and Morris*

Plaintiff alleges that on December 23, 2008, defendants McBride and Kelly handed him off to defendants Leone and Morris for transport to the sergeant.  (Id.)  Plaintiff alleges that defendants Leone and Morris made him walk outside even though he was only wearing his underwear and shoes.  (Id.)  Plaintiff also alleges that defendants Leone and Morris forced plaintiff to the ground, injuring his back.  (Id.)

Dismissed Claims

The claims that defendant Miranda failed to return plaintiff to Reno for his second surgery in September 2008 and that defendant Clark denied plaintiff access to medical care and medication on September 9, 2008, were dismissed based on plaintiff's failure to administratively exhaust these claims.  (ECF No. 65.)

1    Plaintiff's claims alleging that defendants McBride and Kelly used excessive force and

2    that defendant Clark failed to give plaintiff medication on December 23, 2008, were dismissed

3    pursuant to Federal Rule of Civil Procedure 12(b)(6) for failing to state claims upon which relief

4    may be granted.  (ECF No. 81.)  All claims against defendant LaJeuenesse have been dismissed.

5    (Id.)

6    Motion for Summary Judgment:  Defendant Miranda

7    Plaintiff alleges that defendant Miranda failed to provide him with adequate medical care

8    in violation of the Eighth Amendment.  In particular, plaintiff alleges that between August 18,

9    2008, and September 9, 2008, defendant Miranda allowed his prescription for antibiotics to

10   expire, causing plaintiff to suffer an infection.  Plaintiff also alleges that during that time,

11   defendant Miranda allowed his prescriptions for pain medication to expire.

12   "[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate

13   must show 'deliberate indifference to serious medical needs.'"  Jett v. Penner, 439 F.3d 1091,

14   1096 (9th Cir. 2006 ) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  The two part test for

15   deliberate indifference requires the plaintiff to show (1) "a 'serious medical need' by

16   demonstrating that failure to treat a prisoner's condition could result in further significant injury

17   or the 'unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need

18   was deliberately indifferent."  Jett, 439 F.3d at 1096; Wilhelm v. Rotman, 680 F.3d 1113, 1122

19   (9th Cir. 2012).

20   Deliberate indifference is shown where the official is aware of a serious medical need and

21   fails to adequately respond.  Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1018 (9th Cir.

22   2010).  "Deliberate indifference is a high legal standard."  Simmons, 609 F.3d at 1019; Toguchi

23   v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004).  The prison official must be aware of facts from

24   which he could make an inference that "a substantial risk of serious harm exists" and he must

25   make the inference.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).

26   Defendants argue that defendant Miranda did not act with deliberate indifference to

27   plaintiff's serious medical needs.  In support of this argument, defendants rely on the declaration

28   of defendant Miranda and the exhibits attached to his declaration.  (ECF No. 85-3.)  In his

declaration, defendant Miranda states, in relevant part,

> 4.  Kimbro has a history of kidney stones for which he underwent treatment in 2008.

> 5.  On July 7, 2008, Kimbro was prescribed morphine 15 mg for 30 days "till kidney stones addressed surgically, then OFF morphine." (Ex. A.)

> 6.  On July 22, Kimbro's morphine prescription was increased to 30 mg (as indicated by the checkbox ordering morphine 15 mg stopped and then handwritten prescription for MS04 30 mg at the bottom of the page), and Kimbro was given a new thirty-day supply.  (Ex. B.)  Unless renewed or changed, the morphine prescription would expire on August 21, 2008.

> 7.  Kimbro's medical records show that he submitted a Health Care Services Request Form (CDC 7362) on August 14, 2008, in which he complained that his second kidney stone surgery was overdue and that his medication runs out on August 21, 2008.  (Ex. C.)  It is not clear to which medication Kimbro is referring.  Kimbro further specifies his morphine runs out on August 29, 2008, and that his "other pain medication expires as well."  Kimbro's request was received by the triage registered nurse (RN) on August 18, 2008.  (Id.)

> 8.  Kimbro's medical records show that he submitted a Health Care Services Request Form (CDC 7362) on August 19, 2008, in which he complained that he "must see a doctor, pill line worker Clark says all my medication has been discarded because I left the prison for 1 day for surgery.  I have no medication and just had them refilled before my surgery."  (Ex. D.)  The request form does not indicate that it was received by the triage RN.  (Id.)

> 9.  Kimbro's medical records show that he submitted a Health Care Request Services Form (CDC 7362) on August 22, 2008, in which he complained as follows: "need to see doctor – saw nurse line about meds to no avail.  Have not had second surgery for kidney stones.  Still have stints inside.  Pain meds ran out...very much pain with new rash on body."  (Ex. E.)  This request was received on August 27, 2008, by the triage registered nurse (RN), who noted on August 28, 2008 that "PA Miranda will renew his Tramadol."  (Id.)  The RN further noted that Kimbro was to be scheduled to see the medical doctor on 9/3/08.  (Id.)

> 10.  Kimbro's medical records show that he submitted a Health Care Services Request Form (CDC 7362) on August 25, 2008, in which he complained that he is "very ill.  Stints in kidney have caused more bleeding – pain.  Meds have not been refilled.  Rash on his back by kidneys.  No word on second surgery.  Weak feel bad all day."  (Ex. F.)  This request was received by the triage RN on August 27, 2008.

> 11.  Kimbro's medical records show that he submitted a Health Care Services Request Form (CDC 7362) on September 4, 2008, in

which he complained: "I have not had my medication for pain done yet. I have severe pain. Please I need to be seen. Still no word on surgeries. Can't sleep have hard time walking to chow kidney stones worse than ever." (Ex. G.) This request was received by the triage RN on September 5, 2008. (Id.) RN Goulding completed the bottom portion of the form on September 9, 2008, indicating that "Tramadol order waiting on non-formulary. [Morphine] Order expired. PA Miranda renewed Ibuprofen 600 mg [orally as needed] for pain. MD apt to be scheduled for medication evaluation (patient to be seen MD today [9/9] 1330.)" (Id.)

12.   Providers do not need to see patients before their medication expires. Unless changed or renewed, the expiration date concludes the original intended treatment, which does not continue indefinitely.   If the inmate wants his medication re-filled or renewed, he must submit a Health Care Services Request Form (CDC 7362), which is processed by the triage nurse. The triage nurse is then responsible for printing the inmate's medication reconciliation form, highlighting the medication that is being requested by the inmate, and placing the form in the medical provider's box.   Once I receive the highlighted medication reconciliation form in my inbox, I will check the inmate's chart and determine whether or not to refill or renew the medication.

13.   Kimbro's medication administration records (MARS) reveal that during the month of August 2008, Kimbro had valid prescriptions for Flomax, Gabapentin, Morphine, Tramadol and the following "keep on person" medications:   fiber tabs, Phenazopyridine (pyridium), Simvastatin, and Urocit-K. (Ex. H.)

14.   Flomax is used to treat difficult urination.   Gabapentin, Morphine, and Tramadol are pain medications. Phenazopyridine (pyridium) is used to treat urinary tract pain. Simvastatin is used to treat high cholesterol. Urocit-K (or potassium citrate) is used to treat kidney stones.

15.   The only medications which had an expiration date between August 18, 2008, and September 9, 2008, were Morphine (August 21, 2008), Phenazopyridine (August 21, 2008) and Tramadol (August 29, 2008).

16.   On August 28, 2008, I refilled Kimbro's Tramadol prescription for three months. (Ex. I.) I bridged this order, meaning that I renewed the prescription without a face-to-face visit with the patient.

17.   On August 30, 2008, I refilled Kimbro's Morphine prescription for three months. (Ex. J.) I bridged this order, meaning that I renewed the prescription without a face-to-face visit with the patient.

18.   On August 30, 2008, I stopped Kimbro's Phenazopyridine prescription. (Id.) I stopped this medication, which is used to treat urinary tract pain, because it is not intended for long term use. The medication reconciliation form indicated that a last dispense date of

July 22, 2008, and an expiration date of August 21, 2008, meaning Kimbro had already been taking it for a month. (Ex. J.) I would not typically prescribe Phenazopyridine for more than three days.

19.   On September 9, 2008, I treated inmate Kimbro and documented the visit on an Interdisciplinary Progress Note (CDC Form 7230). (Ex. K.) I documented that Kimbro was here for a follow-up visit on kidney stones. (Id.)

20.   September 9, 2008, was my first face-to-face visit with Kimbro concerning the issue of his medications expiring following his June 2008 kidney surgery. I am not responsible for scheduling medical appointments. If an inmate requests to be seen by a medical doctor, he must submit a Health Care Services Request Form (CDC 7362), which is processed by the triage nurse and forwarded to the office technician who is responsible for determining the next available date for an appointment.

21.   During the September 9, 2008 visit, I noted that Kimbro stated that he had right back pain from stones. I noted that Kimbro further stated that he had a right renal stent placed on June 9, 2008, and that he was scheduled with urology for left kidney stent placement, yet he complained he was experiencing painful urination and red (dark) tinted urine since he had his stent placed. I noted that Kimbro complained of chronic low back pain secondary to degenerative disc disease and requested a refill of his morphine prescription (30 mg twice daily), stating that he ran out 16 days ago. I noted that Kimbro said that he had not received Tramadol (50 mg) either. Finally, I noted that Kimbro said he had dull, constant low back pain that is 8/10 on scale. (Id.)

22.   During the September 9, 2008 visit, I noted that I prescribed him Tylenol with codeine for 10 days and pyridium for 10 days. Tylenol with codeine is used to treat pain. Pryidium is used to treat urinary tract pain. I further noted that for his chronic low back pain, I would not refill morphine. However, I noted that the non-formulary request form was filled out to activate Tramadol 50 mg for 90 days. Finally I noted to continue Gabapentin 800 mg.

23.   Tramadol is a non-formulary medication, meaning that it is not routinely stocked in the pharmacy. Requests for non-formulary medications must be submitted for approval by the Chief Physician and Surgeon or Chief Medical officers.

24.   At all times between August 18, 2008 and September 9, 2008, plaintiff had a valid prescription for pain medications, including Tramadol, Gabapentin and Ibuprofen.

25.   At no time did I intentionally allow Kimbro's medications to expire. Rather, once Kimbro's complaints that his medications were expiring came to my attention, I evaluated the need to renew the particular medication. Specifically, I bridged orders renewing his Tramadol and Morphine prescriptions on August 28, 2008 And August 30, 2008 respectively.

10

1   (ECF No. 85-3 at 1-5.)

2       *Alleged Failure to Provide Pain Medication*

3       The undersigned first considers plaintiff's claim that defendant Miranda allowed his pain

4 medication to expire between August 18, 2008, and September 9, 2008. The following facts

5 appear undisputed. In August 2008, plaintiff had prescriptions for Gabapentin, Tramadol,

6 Morphine and Phenazopyridine for pain. The only medications with expiration dates between

7 August 18, 2008, and September 9, 2008, were morphine (August 21, 2008), Phenazopyridine

8 (August 21, 2008) and Tramadol (August 29, 2008). On September 5, 2008, defendant Miranda

9 reinstated plaintiff's Ibuprofen prescription to treat pain as needed.

10       The undersigned next considers which of the pain medications were prescribed to treat

11 plaintiff's pain associated with his kidneys, as this is the pain on which the instant claim is based.

12       In his unverified opposition, plaintiff discusses the types of pain his pain medication was

13 prescribed to treat. (ECF No. 89.) Plaintiff alleges that the Gabapentin was prescribed to treat

14 nerve damage and was not prescribed to treat the pain associated with his kidneys. (Id. at 89.)

15 Plaintiff also alleges that Tramadol was prescribed to treat pain associated with arthritis and

16 degenerative disc disease. (Id.) Plaintiff alleges that narcotics were prescribed to treat the pain

17 associated with his kidneys. (Id.)

18       In Fraser v. Goodale, 342 F.3d 1032 (9th Cir. 2003), the Ninth Circuit indicated that

19 where a party opposing summary judgment has personal knowledge of the unsworn, inadmissible

20 material submitted, such that a party could present the content of the material in admissible form

21 at a trial, the court could consider the material in the summary judgment analysis.

22       Because plaintiff is not a medical professional, the undersigned finds that he does not have

23 sufficient personal knowledge regarding the types of pain his pain medication was prescribed to

24 treat. Therefore, the undersigned does not consider plaintiff's unsworn statements in his

25 opposition regarding the types of pain his medication was prescribed to treat.

26       Defendants do not address the issue of what types of pain the pain medication was

27 prescribed to treat. However, the record is clear that plaintiff was prescribed morphine and

28 Phenazopyridine to treat the pain associated with his kidneys. With respect to Tramadol, the

triage nurse who reviewed plaintiff's August 22, 2008 Health Care Request form wrote that plaintiff complained of pain from his kidney surgery and wanted his Tramadol renewed.  (ECF No. 85-3 at 15.)  The triage nurse further wrote that she spoke with defendant Miranda and he would renew plaintiff's Tramadol prescription.  (Id.)  From this record, the undersigned reasonably infers that Tramadol was prescribed to treat plaintiff's kidney pain.  The record also indicates that plaintiff was prescribed Ibuprofen, as needed for pain associated with his kidneys.

Defendants do not identify the type of pain Gabapentin was prescribed to treat.  However, medical records submitted by defendants indicate that plaintiff was prescribed Gabapentin as early as April 23, 2008, i.e., several months before his kidney surgery.  (Id. at 1.)  The fact that plaintiff suffered great pain in late August and early September 2008, as reflected by the Health Care Request forms he filled out, despite receiving Gabapentin, suggests that this medication was not prescribed to treat plaintiff's pain related to his kidney problems.  Based on this unexplained record, the undersigned cannot find that Gabapentin was prescribed to treat pain related to plaintiff's kidney problems.

The undersigned next considers plaintiff's claim that defendant Miranda allowed his prescriptions for the pain medications prescribed to treat the pain associated with his kidney problems, i.e. morphine, Phenazopyridine and Tramadol, to expire between August 18, 2008, and September 9, 2008.  Defendant Miranda argues that he did not act with deliberate indifference to plaintiff's serious medical needs because he refilled plaintiff's prescriptions for morphine and Tramadol, and plaintiff had access to Ibuprofen.

It is clear that on August 30, 2008, defendant Miranda stopped plaintiff's Phenazopyridine prescription because it was not intended for long term use.  This prescription expired on August 21, 2008.

While defendant Miranda states that on August 30, 2008, he refilled plaintiff's morphine prescription for three months, the record does not entirely support this claim.  Defendant has provided a "Medication Reconciliation Form" indicating that on August 30, 2008, he refilled plaintiff's prescription for morphine 30 mg for kidney pain.  (ECF No. 85-3 at 26.)  This form also indicates that plaintiff had another prescription for morphine for 15 mg, which defendant also

1   ordered refilled on August 30, 2008.  (Id.)   However, in his declaration, defendant states that on

2   September 9, 2008, he did not refill plaintiff's morphine prescription for chronic back pain.  It is

3   possible that the 15 mg morphine prescription was for back pain.  However, it seems unlikely that

4   an inmate would have two separate morphine prescriptions.  Without further explanation, the

5   undersigned finds that defendant's failure to refill plaintiff's morphine prescription on September

6   9, 2008, contradicts his claim that on August 30, 2008, he refilled plaintiff's morphine

7   prescription for 3 months.

8           The record also indicates that plaintiff failed to receive morphine after August 21, 2008.

9   According to defendant, on September 9, 2008, plaintiff told him that he had run out of morphine

10   16 days earlier.  The medication administration record reflecting when plaintiff received

11   morphine indicates that plaintiff did not receive morphine 30 mg. after August 21, 2008.  (ECF

12   No. 85-3 at 21.)  Defendant does not dispute that plaintiff did not receive morphine after August

13   21, 2008.

14           It is possible that defendant refilled plaintiff's morphine prescription but was not

15   responsible for plaintiff's failure to receive morphine.  However, without further explanation of

16   the confusing record, the undersigned cannot find that defendant Miranda refilled plaintiff's

17   morphine prescription on August 30, 2008.

18           With respect to Tramadol, it is undisputed that defendant Miranda refilled plaintiff's

19   Tramadol prescription on August 28, 2008.  This prescription was set to expire on August 29,

20   2008.  However, according to defendant Miranda, Tramadol is a non-formulary medication,

21   meaning that it is not routinely stocked in the pharmacy.  Requests for non-formulary medications

22   must also be submitted for approval by the Chief Physician and Surgeon or Chief Medical

23   Executive.  Therefore, defendant Miranda should have known that plaintiff would not

24   immediately receive Tramadol following his refill of the prescription.  When plaintiff saw

25   defendant Miranda on September 9, 2008, plaintiff had still not received any Tramadol.

26           With respect to Ibuprofen, the medical records attached to defendant Miranda's

27   declaration indicate that as of August 28, 2008, plaintiff's prescription for Ibuprofen was

28   "inactive."  (ECF No. 85-3 at 24.)  The Health Care Services Request form dated September 5,

1  2008, states that defendant Miranda stated that he renewed plaintiff's Ibuprofen prescription.

2  (ECF No. 85-3 at 19.)

3        In summary, taking the facts in the light most favorable to plaintiff, the record

4  demonstrates that plaintiff received no medication for the pain associated with his kidney

5  problems between August 29, 2008, and September 5, 2008.  Beginning on September 5, 2008,

6  defendant Miranda renewed plaintiff's Ibuprofen prescription.  Ibuprofen was the only pain

7  medication plaintiff received for the pain associated with his kidneys from September 5, 2008, to

8  September 9, 2008.

9        For the foregoing reasons, the undersigned cannot find that defendant Miranda did not act

10  with deliberate indifference with respect to plaintiff's need for pain medication.  Based on the

11  facts of this case, to find that defendant did not act with deliberate indifference, the undersigned

12  would have to find that defendant prescribed a readily available medication adequate to treat

13  plaintiff's kidney pain during the at-issue time period.  Defendant has not met his burden of

14  demonstrating that he did so.  Instead, the record shows that when defendant Miranda refilled

15  plaintiff Tramadol prescription on August 28, 2008, he should have known that plaintiff would

16  have to wait to receive Tramadol, as it was non-formulary.  With respect to morphine, based on

17  the confusing record, the undersigned cannot find that defendant refilled this prescription on

18  August 30, 2008.  Instead, the record shows that plaintiff received no morphine after August 21,

19  2008.  While plaintiff had access to Ibuprofen starting on September 5, 2008, plaintiff was not

20  receiving any other medication for his kidney pain.  Defendant does not claim, and provides no

21  evidence supporting a claim, that Ibuprofen was adequate to treat plaintiff's kidney pain.

22        Turning to the second prong of the qualified immunity test, the undersigned finds that a

23  reasonable physician's assistant would have known that allowing plaintiff to go without any pain

24  medication for his kidney pain, other than Ibuprofen, would violate plaintiff's Eighth Amendment

25  right to adequate medical care.  For these reasons, defendant Miranda is not entitled to qualified

26  immunity and should be denied summary judgment as to this claim.

27  ////

28  ////

14

*Antibiotics*

Plaintiff alleges that defendant Miranda allowed his prescription for antibiotics to expire between August 18, 2008, and September 9, 2008, which caused him to develop an infection in his kidney. Defendants' summary judgment does not directly address this issue.

However, from the record it appears that plaintiff was not prescribed antibiotics between August 18, 2008, and September 9, 2008. Therefore, plaintiff's claim that defendant Miranda allowed his prescription for antibiotics to expire during this time is not supported by the record. Accordingly, defendant Miranda should be granted summary judgment as to this claim.

Motion for Summary Judgment:  Defendant Clark

Plaintiff alleges that on September 18, 2008, defendant Clark denied him *all* of his pain medications when he went to the pill line. This claim is not limited to the pain medication plaintiff was prescribed for his kidney problems. In particular, plaintiff alleges that on September 18, 2008, defendant Clark told plaintiff that after he left the prison for his second kidney surgery on September 17, 2008, all of his medications were thrown out. Plaintiff alleges that he did not receive his medication for six days and suffered severe pain.

Defendants argue that defendant Clark did not act with deliberate indifference to plaintiff's serious medical needs. In support of this argument, defendants refer to defendant Clark's declaration and the exhibits attached.  In her declaration defendant Clark states, in relevant part,

> 2. From April 2007 to August 2011, I was employed at HDSP as a Licensed Vocational Nurse (LVN).
>
> 3. During September 2008, I was assigned to B yard second watch (6:00 a.m. to 2 p.m.), and on occasion, I worked overtime on third watch (2 p.m. to 10 p.m.)
>
> 4. B yard was typically staffed with three LVNs and two RNs who were together responsible for preparing for and conducting medication line, a process by which inmates line up to receive their medications. Medication line is conducted twice a day – once in the morning and once in the evening. If the yard was on lock-down or modified program for any reason, medications would be distributed to the inmate's cell, rather than having the inmates line up at a designated area to receive their medication.
>
> 5. As an LVN, my duties included administering medications to

15

inmates, ordering medications, processing medication prescriptions as they are received from the pharmacy, conducting laboratory draws, and gathering data to assist the registered nurses.

6.   I have access to an inmate's prison medical file via the electronic Unit Health Record (eUHR) system.  In preparation for this declaration, I have reviewed the records of inmate Kimbro (V-77359) contained in his medical file as well as records provided to me by the Office of the Attorney General.

7.   When an inmate is given his medication, the RN or LVN I responsible for documenting it on a Medication Administration Record (MAR) form.   The MAR lists valid medication prescriptions, the date the prescription was filled, the expiration date, and the prescribing doctor.  Once an inmate is administered a particular medication, the nurse initials in the box under the date that the medication was given.

8.  Kimbro's September 2008 MAR reveals that during the month of September 2008, Kimbro had valid prescriptions for Tylenol with codeine; Sulfamethoxazole (an antibiotic); Tramadol; Gabapentin; Flomax; and the following medications to keep on person medications:  fiber tabs, Simvastatin (for high cholesterol), and Urocit-K.  (Exs. L-Q.)

9.  Kimbro's September 2008 MARs indicate that on the morning of September 18, 2008, Kimbro was administered Tylenol with codeine, Sulfamethoxazole, Tramadol, Gabapentin, and Flomax. (Exs. L-O,)   I was not the nurse who administered Kimbro's medications on September 18, 2008, as the initials which appear under that date are not mine.  (Id.)

10.  Kimbro's September 2008 MARS indicate that on the evening of September 18, 2008, Kimbro did not receive any medications. (Id.)  Kimbro did not receive any medications on September 19, 2008.  (Id.)

11. There are many reasons why an inmate might not receive his medications on a particular day.  For example, it is possible that the inmate refused his medications or was out of the institution for a medical appointment.  I do not know why Kimbro did not receive his medication on the evening of September 18, 2008, or on September 19, 2008.

12.  On September 19, 2008, I authored a new MAR for a seven day supply of Tylenol with codeine.  (Ex. P.)  The record indicates that the order was filled on September 19, 2008, and that I administered Tylenol with codeine to Kimbro on the morning of September 19, 2008 and another nurse (LVN Hamilton) administered it to him on the evening of September 19, 2008.  (Id.)

13.  Kimbro did not receive Tylenol with codeine on September 20, 2008.  (Id.)  I do not know why Kimbro did not receive his Tylenol with codeine on that day.

16

14.   Kimbro continued to receive Tylenol with codeine on September 21, 2008, to September 24, 2008. (Exs. P-Q.) I was not the nurse who administered him the Tylenol with codeine on those dates, as the initials that appear in the boxes under those dates are not mine.

15.   Kimbro's September 2008 MARs indicate that his Tramadol prescription was discontinued sometime after September 18, 2008. (Ex. L.) A nurse wrote at the bottom of the MAR that "[inmate] went [out to medical] no new orders written for this med." (Id.) I was not the nurse who wrote "DC'D" or the note that Kimbro went out to medical.

16.   At no time, from September 18, 2008 to September 23, 2008, did I intentionally or unintentionally deny Kimbro his medications.

17.   As an LVN, I did not have the authority to cancel or discontinue an inmate's medical prescriptions.   However, if an inmate leaves the prison for more than 72 hours, his medications are returned to the pharmacy.

(ECF No. 85-4 at 1-3.)

The undersigned herein summarizes the information in the MAR documents attached to defendant Clark's declaration with respect to plaintiff's receipt of pain medication, i.e., Tramadol, Tylenol with codeine, and Gabapentin.  The record demonstrates that between September 18, 2008, and September 24, 2008, plaintiff received Tramadol on the morning of September 18, 2008. (Id. at 6.)   The MAR states that plaintiff's Tramadol was discontinued and that plaintiff went out for a medical appointment with no new orders written for Tramadol.  (Id.)

Tylenol with codeine was prescribed twice a day for plaintiff.  (Id. at 7.)  Plaintiff received Tylenol with codeine on the morning of September 18, 2008, twice on September 19, 2008, twice on September 21, 2008, and on the morning of September 22, 2008.  (Id. at 7, 13, 15.)

Plaintiff received Gabapentin on the morning of September 18, 2008.  (Id. at 11.)  The undersigned cannot find any indication in the records that plaintiff received Gabapentin at any other time between September 18, 2008, and September 24, 2008.

In summary, the only pain medication plaintiff received after September 18, 2008, was Tylenol with codeine.  On September 19, 2008, defendant Clark prepared a new "MAR" for a seven day supply of Tylenol with codeine.

////

17

1        Attached as an exhibit to plaintiff's opposition is a typewritten note by Licensed Clinical

2  Social Worker ("LCSW") Boretz dated September 19, 2008.  (ECF No 89 at 23.)  LCSW Bortez

3  writes,

> Follow-up, Individual Contact:  SUBJECTIVE – Mr. Kimbro was assessed earlier today as he reported suicidal ideation apparently in desperation to receive post-surgery medical attention.  Mr. Kimbro reports continued physical pain and concern for his regular prescribed medical medications which appear to have been discontinued when he left the institution for his surgery and which have not been renewed.  At Mr. Kimbro's request, I took his concerns to D-Yard nursing staff and hand delivered his request for medical attention.  I spoke with RN Daniels and LVN Clark both of whom suggested I simply put Kimbro's request for medical contact in the pile of all those retrieved from B-yard inmates for that day.  I explained that it appears his daily medications had not been renewed when he arrived back from surgery and both RN Daniels and LVN Clark appeared familiar with Mr. Kimbro.  Mr. Kimbro continues to deny impulses for self harm and stated, "I hope I don't have to go man down again to get my meds.

13  (Id.)

14        A prisoner need only receive adequate treatment, not his chosen treatment.  Herrera v.

15  Beregovskays, 2013 WL 6572585 at *3 (E.D. Cal. 2013), citing Hill v. Curcione, 657 F.3d 116,

16  123 (2d Cir. 2011).  A failure to provide a prisoner with stronger pain medication is not

17  indifference where no medical provider recommended treatment from that provided, or acted with

18  a culpable state of mind.   Id., citing Hill, 657 F.3d at 123; Rush v. Fischer, 923 F.Supp.2d 545,

19  554-55 (S.D.N.Y. 2013) (prison nurse's refusal to provide narcotic medication to manage pain not

20  indifference where ibuprofen was provided and facility doctor also refused to provide narcotic

21  medication).

22        The record in the instant case is distinguishable from the cases cited above.  In the instant

23  case, plaintiff had prescriptions for three pain medications.  The note from LCSW Boretz

24  indicates that on September 19, 2008, he told defendant Clark that it appeared that plaintiff's

25  medications had not been renewed when he returned to the prison following surgery.  Therefore,

26  on September 19, 2008, defendant Clark had knowledge that plaintiff was not receiving any of his

27  medications.  While it appears likely that defendant Clark wrote plaintiff's new prescription for

28  Tylenol with codeine on that date, it is unclear why she did not issue new prescriptions for

1   plaintiff's other medication or take additional steps to see that plaintiff received his medications.

2          Defendants do not argue, and the record does not suggest, that this is a case where

3   defendant Clark determined that plaintiff required only Tylenol with codeine for pain, after

4   consulting with a medical doctor.

5          Without additional information regarding why defendant Clark did not take further steps

6   to ensure that plaintiff received all of his medications after the matter was brought to her attention

7   by LCSW Boretz, the undersigned cannot find that she did not act with deliberate indifference.

8   Without additional information regarding how and why defendant Clark responded to LCSW

9   Boretz, the undersigned cannot evaluate the second prong of the qualified immunity analysis.  For

10  these reasons, defendant Clark should be denied summary judgment.

11  <u>Motion for Summary Judgment:  Defendants McBride and Kelly</u>

12         Plaintiff alleges that on December 23, 2008, defendants McBride and Kelly made him

13  walk outside wearing only his underwear and shower shoes.

14         Defendants McBride and Kelly argue that they did not violate plaintiff's constitutional

15  rights.  In support of this argument, defendants first refer to the declaration of defendant

16  Hougland which explains why plaintiff defendants McBride and Kelly took plaintiff outside.

17  Defendant Hougland states, in relevant part,

18             3.   At approximately 7:45 p.m. on December 23, 2008, while
               conducting my duties as Program Sergeant in Facility B, Licensed
19             Vocational Nurse (LVN) Clark contacted me and told me that
               inmate Kimbro (V-77359) had threatened her.
20
               4.  LVN Clark told me that because Kimbro had not turned on his
21             cell light, she did not issue him his medication.

22             5.  LVN Clark told me that Kimbro then yelled out of his cell at
               LVN Clark and said, "You better hope I don't get my hands on
23             you."

24             6.   Due to this threat, I directed Officers McBride and Kelly to
               escort inmate Kimbro to the Facility B Program Office.
25

26  (ECF No. 85-7 at 1-2.)

27         The declarations of defendants McBride and Kelly describe what happened during the

28  escort ordered by defendant Hougland.  As indicated above, the only remaining claim against

defendants McBride and Kelly is that they made plaintiff walk outside, in the winter, in his

underwear and shower shoes.  Plaintiff's claim alleging excessive force against these defendants

has been dismissed.

In his declaration, defendant Kelly states, in relevant part,

> 3.  [On] December 23, 2008, at approximately 8:00 p.m., Officer McBride and I entered Facility B Building 4 (B4) to escort Kimbro to the program office to be counseled and reported threats toward medical staff.  The program office is located in another building across the yard from Building 4, where Kimbro was housed.  The distance from B4 to the program office is approximately 100 yards.
>
> 4.  Inmate Kimbro became very belligerent and stated, "I didn't say shit to that bitch."
>
> 5.  Officer McBride and I exited Building 4 and, due to inmate Kimbro's resistive behavior, placed Kimbro against the outer wall of the building.  Kimbro put his right foot against the wall and kicked away from the wall forcing his body towards Officer McBride and me.
>
> 6.  Officer McBride and I simultaneously spun to the left and, utilizing our momentum, forced Kimbro to the ground.  Kimbro landed face down on his stomach with Officer McBride to Kimbro's left side, while I was kneeling down on Kimbro's right side.
>
> 7.  I held Kimbro's right hand and wrist using my left hand and had my right hand on Kimbro's right shoulder.  Officer McBride held Kimbro's left wrist using his right hand and had his left hand between Kimbro's shoulder blades.  At no time did I place my elbow or knee on Kimbro's back.
>
> 8.  Responding staff arrived, and at Sergeant Hougland's direction, Office Maydole applied leg restraints on Kimbro.
>
> 9.  Officers Leone and Morris relieved Officer McBride and me, so that they could continue to escort Kimbro to the program office.
>
> 10.  After I was relieved, I went to the restroom to wash my hands and did not see Officers Leone and Morris' further escort of Kimbro.
>
> 11.  I do not recall whether there was snow on the ground outside.  At no time did I shove Kimbro's face in the ground.
>
> 12.  I do not recall what inmate Kimbro was wearing, but it was my normal practice to allow an inmate to get dressed before taking him out of his cell.  However, if any inmate is being resistive and/or non-compliant, it may be necessary to get the inmate out of the cell in order to gain compliance.  Under such circumstances, getting the inmate out of the cell and into restraints would take priority over

1    allowing the inmate to get fully dressed.

2    (ECF No. 85-5 at 1-2.)

3    Defendant McBride's declaration is similar to that of defendant Kelly's declaration.  (ECF

4    No. 85-6.)  However, defendant McBride states that, "I do not recall what Kimbro was wearing,

5    but due to the reported threats, it was necessary to quickly remove him from his cell in order to

6    gain compliance."  (Id. at 3.)

7    Plaintiff does not dispute defendants' claim that the distance he was made to walk outside

8    was 100 yards.

9    The Eighth Amendment protects prisoners from "inhumane methods of punishment" and

10    "conditions of confinement."  Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (as

11    amended).  To state a claim that a defendant has violated the Eighth Amendment, a plaintiff must

12    "objectively show that he was deprived of something sufficiently serious" and "make a subjective

13    showing that the deprivation occurred with deliberate indifference to the inmate's health or

14    safety."  Foster v. Runnels, 554 F.3d 807, 812 (9th Cir. 2009) (internal quotation marks omitted).

15    As to the first prong, a deprivation is sufficiently serious when a prison official's "act or

16    omission results in the denial of the minimal civilized measure of life's necessities."  Id. (internal

17    quotation marks omitted).  As to the second prong, the defendants must have had a "sufficiently

18    culpable state of mind," that is, "a state of mind more blameworthy than negligence."  Farmer v.

19    Brennan, 511 U.S. 825, 834–35 (1994) (internal quotation marks omitted).

20    It is undisputed that defendants made plaintiff walk 100 yards outside in December

21    wearing his underwear and shower shoes.  Whether there was snow on the ground, and the

22    amount, is disputed.  The amount of time plaintiff was outside is unclear due to the conflicts

23    plaintiff had with defendants McBride and Kelly, and, as will be later discussed, defendants

24    Leone and Morris.  However, plaintiff does not allege any prolonged discomfort or adverse

25    consequence stemming from his exposure to the cold.  For this reason, the undersigned

26    recommends that defendants McBride and Kelly be granted summary judgment as to this claim.

27    See Swenson v. Cnty. of Kootenai, 2014 WL 585726, at *16 (D. Idaho Feb.14, 2014) (finding

28    plaintiff's allegations that she walked through three inches of snow in sandals insufficient to state

1   Eighth Amendment claim in part because she alleged "no adverse result from her brief exposure

2   to cold weather"), accepted by 2014 WL 1247801 (D. Idaho Mar. 25, 2014); Tyler v. Watson,

3   2009 WL 4110304, at *1, *3 (W.D. Va. Nov. 25, 2009) (granting summary judgment on

4   plaintiff's Eighth Amendment claim involving five-minute-long strip search outside in "freezing

5   thirty-degree temperature" because "he did not suffer any objectively serious injury"); Taylor v.

6   Gomez, 1998 WL 34256-91 at *4 (E.D. Cal. 1998) (requiring inmate to walk a half-mile to

7   breakfast in rain and cold wearing blue jeans and blue shirt did not state a colorable Eighth

8   Amendment claim).[1]

9        Because the undersigned finds that defendants McBride and Kelly did not violate

10  plaintiff's Eighth Amendment rights, there is no need to address the second prong of the qualified

11  immunity analysis.

12  Motion for Summary Judgment:  Defendant Hougland

13       Plaintiff alleges that on December 23, 2008, defendant Hougland placed leg irons on his

14  lower legs.  Plaintiff alleges that the leg irons were so tight that they cut into his legs and caused

15  bleeding.  Defendants move for summary judgment as to this claim on grounds that defendant

16  Hougland did not apply the leg irons to plaintiff.  Defendants further argue that there is no

17  evidence that defendant Hougland ordered the leg irons to be applied too tightly.

18       In support of this argument, defendants refer to the declaration of defendant Hougland

19  who states, in relevant part,

20           6.   Due to this threat, I directed Officers McBride and Kelly to
21      escort inmate Kimbro to the Facility B Program Office.

22           7.   A short time later, I walked out of the Program Office and
        looked across the yard to Building 4, where I saw who I
23      subsequently learned was inmate Kimbro and Officers McBride and
        Kelly on the ground in front of Building 4, to the right of the door.

24

---

25  [1]   Defendants also argue that there is no evidence that they had a sufficiently culpable state of
    mind.  Defendants argue that due to the reported threat made by plaintiff, it was necessary to
26  quickly get plaintiff out of his cell in order to gain compliance.  Defendants argue that getting
    plaintiff out of his cell and into restraints took priority over allowing plaintiff to get fully dressed.
27  In his verified complaint, plaintiff denies making threats against defendant Clark.  (ECF No. 1 at
    10.)  Therefore, whether plaintiff made the threat against defendant Clark is disputed.

28

8.  I radioed Central Control and notified them of the Code 1 on B Yard.  I then responded to their location.

9.   When I arrived, Officer McBride was kneeling on inmate Kimbro's left side with his right hand on Kimbro's upper back and left hand holding somewhere on Kimbro's left arm.

10.  Officer Kelly was leaning down on inmate Kimbro's right side with his left hand holding Kimbro's right wrist.  I could not see where Officer Kelly's right hand was.

11.   I then ordered Officer Maydole to apply leg restraints on inmate Kimbro.   I observed Officer Maydone apply the leg restraints on Kimbro.  I did not personally apply the leg restraints on Kimbro.

12.  Once the leg restraints were applied, Officer Leone relieved Officer Kelly, and Officer Morris relieved Officer McBride.

13.  Officers Leone and Morris supported inmate Kimbro's arm while Kimbro stood up.  Once Kimbro was standing, Officers Leone and Morris began escorting him across the yard to the Program Office.

14.  As Officers Leone and Morris escorted inmate Kimbro across the yard, I stood behind.   Officer Leone was escorting from Kimbro's right side, and Officer Morris was escorting from Kimbro's left side.

15.  When the escort was about 200 feet from Building 4, inmate Kimbro began to twist his upper body and arms and attempted to pull away from Officers Leone and Morris.

16.  I heard someone yell for Kimbro to get down, and then I saw Officers Leone and Morris use their body weight to force Kimbro face down on the ground.

17.  I radioed Central Control and advised them of a Code 1.

18.   Officer Norman later told me that while trying to restrain inmate Kimbro's legs, Kimbro kicked him on his right shin.  Officer Norman had a hold of inmate Kimbro's lower legs with his hands.

19.  I instructed Officers Bennett and Pasillas to relieve Officers Leone and Morris.   Officers Bennet and Pasillas supported Kimbro's upper arms to stand him up and escorted him to the Facility B Program Office.

20.  Once inside the Program Office, inmate Kimbro was secured in Holding Cell # 1.

21.  At about 9:00 p.m., Investigate Services Unit Officers, Wheeler and Rodriguez arrived to the Program Office to interview inmate Kimbro.   Once Officers Wheeler and Rodriguez completed their

interview with Kimbro, they informed me that Kimbro had invoked his Miranda rights.

22.  Due to the injuries on Kimbro's face, a use of force interview was required.  However, because Kimbro had invoked his Miranda rights, the decision was made not to question him.

23.  Officer Pasillas operated the camera during this interview.  I started the interview at about 11:00 p.m. and videotaped Kimbro's injuries to his face, knees, right ankle, back and right shoulder.

24.  At about 11:02 p.m., we finished recording. I collected the video tape from Officer Pasillas, and the video tape was retained with the incident package.

(ECF No. 85-7 at 2-3.)

In the complaint, plaintiff alleges that defendant Hougland placed leg irons on his lower legs that were applied so tightly that they caused his legs to bleed.  (ECF No. 1 at 11.)   In his opposition, plaintiff states,

Defendant Hougland claims he's not responsible for leg irons being too tight as he only ordered them but did not put them on.  Sgt. Hougland ordered plaintiff to be transported across the yard in leg irons when only wearing shower shoes and underwear with a lot of snow on the ground even though plaintiff was A.D.A. mobility impaired and had medical issues he was aware of.  It has been shown plaintiff began to bleed from his ankles due to tight leg irons.  That he could not walk and tripped several times.

(ECF No. 89 at 18.)

In his opposition, plaintiff appears to abandon his claim that defendant Hougland personally put on the leg irons.  Instead, plaintiff now claims that defendant Hougland ordered that the leg irons be put on plaintiff and knew that they had been applied too tightly because his ankles were bleeding.  Plaintiff does not appear to claim that defendant Hougland ordered the leg irons to be applied too tightly.

While defendant Hougland may not have personally applied the leg irons, a prison official's failure to intervene can violate a prisoner's Eighth Amendment rights.  See Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir. 1995) (failure to intervene and protect can violate a prisoner's Eighth Amendment rights).  However, plaintiff did not present this theory of liability in his complaint.  Defendants' summary judgment motion did not address this new claim raised in

24

1    the opposition.  A plaintiff may not raise a new theory of liability for the first time in his

2    opposition to a summary judgment motion without amending his complaint.  See Coleman v.

3    Quaker Oats Co., 232 F.3d 1271, 1291–92 (9th Cir. 2000).  For this reason, the undersigned does

4    not address this claim.

5         Because plaintiff has abandoned the claim he raised against defendant Hougland in the

6    complaint, defendant Hougland should be granted summary judgment.

7    <u>Motion for Summary Judgment:  Defendants Leone and Morris</u>

8         Plaintiff raises two claims against defendants Leone and Morris.  First, plaintiff alleges

9    that on December 23, 2008, defendants Leone and Morris made him walk outside even though he

10   was only wearing his underwear and shower shoes, i.e., the same claim he raised against

11   defendants McBride and Kelly.  Second, plaintiff alleges that on December 23, 2008, defendants

12   Leone and Morris used excessive force against him when they forced him to the ground, injuring

13   his back.

14        *Exposure to the Elements*

15        It is undisputed that defendants Leone and Morris took over the escort of plaintiff from

16   defendants McBride and Kelly.  Plaintiff also does not dispute that he was transported 100 yards

17   in the inclement weather.  For the reasons the undersigned found that defendants McBride and

18   Kelly should be granted summary judgment as to this claim, the undersigned recommends that

19   summary judgment be granted to defendants Leone and Morris.

20        *Excessive Force*

21        Plaintiff alleges that defendants Leone and Morris used excessive force against him during

22   the transport when they forced him to the ground, injuring his back.

23        To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison

24   conditions must involve "the wanton and unnecessary infliction of pain."  Rhodes v. Chapman,

25   452 U.S. 337, 347 (1981).  The inquiry as to whether a prison official's use of force constitutes

26   cruel and unusual punishment is "whether force was applied in a good-faith effort to maintain or

27   restore discipline, or maliciously and sadistically to cause harm."  Hudson v. McMillian, 503 U.S.

28   1, 6–7 (1992); Whitley v. Albers, 475 U.S. 312, 320 (1986).

"The objective component of an Eighth Amendment claim is ... contextual and responsive to contemporary standards of decency." Hudson, 503 U.S. at 8 (internal quotation marks and citations omitted).  A prison official's use of force maliciously and sadistically to cause harm violates the contemporary standards of decency. Wilkins v. Gaddy, 559 U.S. 34, 37 (2010).  However, "[n]ot 'every malevolent touch by a prison guard gives rise to a federal cause of action." Wilkins, 559 U.S. at 37 (quoting Hudson, 503 U.S. at 9).  Factors that can be considered are "the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted." Whitley, 475 U.S. at 321; Marquez v. Gutierrez, 322 F.3d 689, 692 (9th Cir.2003).

Defendants argue that they did not use excessive force against plaintiff.  In support of this argument, defendants rely on the declarations of defendants Hougland, Leone and Morris.  The declaration of defendant Hougland describing the circumstances leading to the incident involving defendants Leone and Morris is set forth above.  Defendant Hougland states that he witnessed plaintiff begin to thrust his upper body and arms and attempt to pull away from defendants Leone and Morris as they escorted plaintiff.  (ECF No. 85-7 at 2.)  Defendant Hougland heard someone yell for plaintiff to get down, and he then saw defendants Leone and Morris use their body weight to force plaintiff to the ground.  (Id. at 3.)

In his declaration, defendant Leone states, in relevant part,

> 7.  I then relieved Officer Kelly and took control of Kimbro's right side by placing my right hand on Kimbro's left arm and my left hand on Kimbro's upper back.  Officer Morris relieved Officer McBride by using his right hand to take hold of Kimbro's left arm.
>
> 8.  Officer Morris and I then helped Kimbro to his feet and began to escort Kimbro across the yard to the Facility B Program Office.
>
> 9.  Approximately halfway across the yard, Kimbro began to turn from side to side and pull away from the escort.
>
> 10.  I immediately told Kimbro to get down as Officer Morris and I used our body weight to force Kimbro to the ground.
>
> 11.  Once on the ground, Kimbro began to kick his legs back and forth.  I maintained control of Kimbro's upper body with my left hand on Kimbro's upper back and my right hand on Kimbro's head.  Officer Morris had control of Kimbro's left side, and Officer Norman took control of Kimbro's legs. At no time did I place my

elbow or knee on Kimbro's back or shove his face into the ground.

12.  Officer Bennett then relieved me and took control of Kimbro's right side.  Officer Pasillas relieved Officer Morris and took control of Kimbro's right side.

13.  Officers Bennett and Pasillas then helped Kimbro to his feet and escorted him to the Facility B Program Office.

(ECF No. 85-8 at 2.)

In his declaration, defendant Morris states, in relevant part,

4.  When I arrived at the location of the incident, I saw an inmate who was later identified as Kimbro (V-77359) lying face down on the ground and restrained in handcuffs in front of the Building 4 yard door.

5.  Officer Kelly was squatting on Kimbro's right side, and Officer McBride was squatting on Kimbro's left side.  Officers Kelly and McBride appeared to be applying downward pressure using their hands on Kimbro's shoulders.

6.  Sergeant Hougland then ordered Officer Leone and me to relieve Officers McBride and Kelly.  I relieved Officer McBride by taking control of Kimbro's left arm with my right hand, and Officer Leone relieved Officer Kelly.

7.  Officer Leone and I then helped Kimbro to his feet and began to escort Kimbro across the exercise yard to the Facility B Program office.

8.  Officer Norman followed behind to provide coverage of the escort.

9.  On our escort to the Program Office, Kimbro began to turn his body towards Officer Leone and turned his shoulders from side to side to pull away from our escort.  Officer Leone and I yelled "get down," and used our physical strength and body weight to force Kimbro to the ground.

10.  While on the ground, I saw Kimbro kick Officer Norman with his right foot.  Officer Norman yelled, "Quit kicking," and with both his hands on Kimbro's ankles applied downward pressure to stop Kimbro from kicking him.

11.  With my left hand on Kimbro's right shoulder, and my right hand on Kimbro's right hand, I applied downward pressure and waited for responding staff to arrive.  At no time did I place my elbow or knee on Kimbro's back or shove his face into the ground.

12.  When responding staff arrived, Officer Pasillas relieved me, while Officer Bennett relieved Officer Leone.

1  (ECF No. 85-9 at 2.)

2          In the verified complaint, plaintiff alleges that during the escort, he tripped several times

3  with Officer Leon and Morris.  (ECF No. 1 at 11.)  Plaintiff alleges that he could not walk

4  because the leg irons were applied so tightly.  (Id.)  Plaintiff alleges that he was not resisting, he

5  just could not walk.  (Id.)

6          In his unverified opposition, plaintiff states, in relevant part,

7               It has been shown that plaintiff began to bleed from his ankles due
               to tight leg irons.  That he could walk and tripped several times.
8               Officers Leone and Morris threw plaintiff to the ground again
               claiming resistance because of leg irons and plaintiff tripping,  At
9               no time was plaintiff ever written up for or given a hearing for or
               found guilty of that resisting.  Officers and Leone did place extreme
10              pressure on plaintiff's back causing him to thrash around due to
               extreme pain.  It is true that plaintiff had mobility impaired issues
11              due to his back.

12  (ECF No. 89 at 18.)

13         Plaintiff's allegations in his unverified opposition are very similar to those made in his

14  complaint.  Because plaintiff has personal knowledge of the alleged events, the undersigned

15  considers his description of the incident contained in his opposition.  Fraser v. Goodale, supra.

16         Despite the number of declarations submitted by defendants, the issue of whether plaintiff

17  resisted defendants Leone and Morris is a materially disputed fact.  Plaintiff alleges that he did

18  not resist defendants.  Plaintiff alleges that he could not walk and fell because the leg irons were

19  applied so tightly.  In contrast, defendants claim that plaintiff turned from side to side, actively

20  resisting the escort.

21         Taking the facts in the light most favorable to plaintiff, plaintiff did not resist defendants.

22  If plaintiff had trouble walking due to the tight leg irons and repeatedly fell, defendants' use of

23  force may not have been justified.

24         Turning to the second prong of the qualified immunity analysis, the undersigned finds that

25  a reasonable officer would know that forcing an inmate to the ground who was having difficulty

26  walking due to the application of leg irons, then applying force to restrain him, would violate the

27  inmate's Eighth Amendment rights.  Accordingly, defendants Leone and Morris should not be

28  granted summary judgment as to this claim.

28

In the summary judgment motion, defendants further argue that they are entitled to summary judgment on grounds that plaintiff suffered no injuries and the force they used was de minimis. The dispositive inquiry for an excessive force claim is not what degree of injury the inmate suffered, but whether the degree of force used by defendants was applied "maliciously and sadistically for the very purpose of causing harm" or "in a good faith effort to maintain or restore discipline." Hudson v. McMillian, 503 U.S. at 6. While the absence of serious injury is relevant to the Eighth Amendment inquiry, it does not end it. Id. at 7. According to plaintiff, he had difficulty walking due to the leg irons and repeatedly fell. Plaintiff alleges that defendants threw him to the ground, even though he was not resisting, and put extreme pressure on his back. These facts, if proven, demonstrate that defendants used greater than de minimis force with the intent to harm plaintiff and not for disciplinary purposes, thereby violating the Eighth Amendment.

Accordingly, IT IS HEREBY RECOMMENDED that defendants' summary judgment motion (ECF No. 85) be granted as to the following claims: 1) defendant Miranda allowed plaintiff's antibiotic prescription to expire; 2) defendants McBride, Kelly, Leone and Morris violated the Eighth Amendment by exposing plaintiff to the elements; defendants' motion should be denied in all other respects.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 24, 2015

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Kim2154.sj

29